*Exhibit 5*

April 18, 2019

**Uploaded to EEOC Responding Portal**

Re: *Lindsey E. Stewart v. Chik-Fil-A*
    EEOC No.: 488-2019-00255

Three Little Cows, Inc. (the Company) submits the following position statement in response to Claimant Lindsey Stewart's Charge of Discrimination filed with the Equal Employment Opportunity Commission (EEOC).

## I. FACTUAL BACKGROUND

### *The Parties.*

Three Little Cows, Inc. is based in Encinitas, California and is a franchisee of a Chick-Fil-A Restaurant (the Restaurant) located at 194 N. El Camino Real, Encinitas, California 92024. Danny Putman, who owns the franchise, is dedicated to fostering a positive and supportive workplace environment for his team.

Claimant is a former Team Member at the Restaurant. Throughout her brief tenure, management observed that Claimant created a hostile work environment for her peers. Claimant routinely yelled at her coworkers and undermined her supervisors. Several of Claimant's coworkers complained to management about Claimant's behavior. When Claimant failed to improve following multiple coaching sessions and a performance improvement plan, the Restaurant terminated Claimant on December 19, 2018.

### *Claimant's Employment at the Restaurant.*

On September 13, 2018, the Restaurant hired Claimant as a Team Member. Claimant's employment was at all times at-will. (Exhibit A, Acknowledgment of At-Will Employment, signed by Claimant on September 13, 2018.)

Claimant informed Mr. Putman she specifically sought to work at the Restaurant because she was impressed with his treatment of his employees. Claimant's son is employed at the Restaurant. Prior to Claimant's hire, Mr. Putnam worked with a local dentist to provide her son free dental work, including cleanings, fillings, root canal, a new bridge, and a veneer, which would normally cost $4,000 to $7,000. Due to Claimant's son's employment with the Restaurant, Mr. Putnam did not perform a reference check with Claimant's previous employers and was unaware of her litigious background and the judgment a prior employer ultimately obtained

Exh 5



Page 2

against Claimant.

As a Team Member assigned to the front of the Restaurant, Claimant's duties included greeting customers, taking orders, and cleaning the dining area. After her training, Claimant requested to work in the kitchen area. The Restaurant accommodated her request, and management transferred Claimant to a prep cook position. In her new role, she prepared all ingredients by washing and chopping vegetables, prepared simple dishes such as salads, and maintained a clean and orderly prep table. In this position, Claimant reported to Terra Aguilar (Kitchen Director) and Eric Garcia (Kitchen Manager).

### *Claimant Exhibits an Aggressive Attitude and Creates a Hostile Work Environment for Her Peers.*

Claimant began exhibiting poor performance immediately after her hire and exhibited insubordinate behavior throughout her training period. Ms. Aguilar observed that, during her daily attempts to train Claimant, Claimant was dismissive, ignored her, repeatedly cut her off, became panicked and frustrated, and routinely disregarded or forgot instructions. (Exhibit B, Declaration of Terra C. Aguilar [Aguilar Dec.], ¶ 5.)

On October 15, 2018, Ms. Aguilar trained Claimant on preparing salads. (Exhibit B, Aguilar Dec., ¶ 6.) Although this should have been a routine training, Claimant's attitude and behavior made it an unnecessarily difficult process. (*Ibid.*) During the training, Claimant became outwardly frustrated and kept interrupting Ms. Aguilar, stating that she would instead "figure it out" on her own. (*Ibid.*) She also interjected to ask questions about steps ahead instead of paying attention to the training at hand. (*Ibid.*) Ms. Aguilar patiently stated she would show Claimant if she let her finish. Claimant became angry and told her to "finish then." (*Ibid.*) The same day, Ms. Aguilar showed Claimant where to locate the chicken. (*Ibid.*) Only 15 minutes later, Claimant ran into the kitchen claiming she did not have any chicken. (*Ibid.*) Ms. Aguilar again showed Claimant where to locate the chicken. (*Ibid.*) This behavior made Ms. Aguilar feel that Claimant was not listening to Ms. Aguilar during the training period. (*Ibid.*)

On October 16, 2018, Ms. Aguilar became aware Claimant told a coworker she did not leave work on time because she had to clean up Ms. Aguilar's prep area. (Exhibit B, Aguilar Dec., ¶ 8.) Ms. Aguilar took the concern seriously and asked Claimant how she could improve her prep area so that Claimant could leave work on time. (*Ibid.*) Claimant denied knowing what Ms. Aguilar was talking about and then began viscously screaming at her coworker, "You! You threw me under the bus to *my* boss! I was just talking to you and you told on me?!?" She continued to scream, "You cannot be trusted! I never want to speak to you again! You are so rude, you never say hi to me when I come in!" (*Ibid.*) Claimant then began chastising her peer about her manners. (*Ibid.*) Her coworker looked on the verge of tears as Ms. Aguilar attempted to de-escalate the situation. (*Ibid.*) At that point, **Claimant grabbed a knife, screaming and shouting.** (*Ibid.*) Then she walked over to cut lettuce. (*Ibid.*) This erratic behavior alarmed Ms. Aguilar and she feared Claimant would become violent with the knife. (*Ibid.*) Ms. Aguilar also found it unacceptable that Claimant would scream at her peer. (*Ibid.*) Due to the volume of her yelling, Ms. Aguilar was concerned that customers might overhear. (*Ibid.*) Ms. Aguilar pulled the coworker into the office and gave her a hug because she was shaken up. (*Ibid.*) Mr. Garcia was

April 18, 2019
Page 3

in the office and said he would speak to Claimant about the incident. (*Ibid.*) During Mr. Garcia's conversation with Claimant, Claimant became aggressive and cursed at Mr. Garcia. (Exhibit C, Declaration of Eric Garcia [Garcia Dec.], ¶ 6.) She deflected blame and instead pointed fault to her coworker and Ms. Aguilar. (*Ibid.*) Mr. Garcia had to repeatedly tell Claimant to lower her voice and not use profanity at him. (*Ibid.*)

During a Saturday lunch shift a few weeks later, the front of the Restaurant ran out of multiple prep items. (Exhibit B, Aguilar Dec., ¶ 9.) When Ms. Aguilar went to check on Claimant, she saw fifteen empty trays stacked together. (*Ibid.*) Ms. Aguilar reminded Claimant to refill the trays as they come. (*Ibid.*) Claimant, in turn, snapped at Ms. Aguilar and stated she knew and that she was doing it. (*Ibid.*) Ms. Aguilar did not say anything back for fear she would become irate again. (*Ibid.*)

Ms. Aguilar and Mr. Garcia observed that Claimant's inability to complete tasks and her resistance to training continuously caused food waste. They also witnessed Claimant chastising the front of the Restaurant Team Members. The back of the Restaurant Team Members likewise voiced complaints that they disliked going to the prep station because Claimant would stop them to either complain or talk. Team Members reported to management that Claimant would corner them or follow them around to gossip or complain about the front of the Restaurant Team Members. Multiple employees reported that they felt harassed and uncomfortable being around Claimant.

## *After Numerous Verbal Coaching Sessions, Claimant Receives a Performance Improvement Plan.*

Given Claimant's aggressive and insubordinate behavior, the Restaurant had every reason to terminate her employment during her training. However, given Mr. Putman's outlook and desire to help employees, he instead decided to try to work with Claimant to help her succeed. However, after three months of verbal coaching, Claimant had not improved. Thus, on December 13, 2018, Mr. Garcia and Mr. Putnam met with Claimant to discuss her performance and provide her with a written coaching and performance improvement plan. (Exhibit C, Garcia Dec., ¶ 7; Exhibit D, Written Performance Improvement Plan; Exhibit E, Declaration of Danny Putnam [Putnam Dec.] ¶ 4.) The coaching plan identifies key areas in which Claimant needed improvement: (1) efficiency, (2) approval before acting on new ideas, (3) listening to instructions, (4) not fighting with kitchen and leaders, (5) looking at the KPS monitor for specials, (6) controlling her emotions and tone, (7) being on time, and (8) following the Restaurant's cultural principals (positive attitude, live with integrity, own the team, and grow daily). (Exhibit D, Written Performance Improvement Plan.) During the meeting, Claimant was defensive, deflected blame, and refused to acknowledge any wrongdoing. (Exhibit C, Garcia Dec., ¶ 7.) Her demeanor worried Mr. Garcia and Mr. Putnam. More alarming, Claimant blatantly lied, denying Mr. Garcia ever met with her before to address these concerns. (*Ibid.*)

After the meeting, Claimant's attitude at the Restaurant worsened. In response to her written coaching plan, Claimant handed Mr. Putnam a three-page letter rebutting the key areas Mr. Garcia and Mr. Putnam requested Claimant improve upon. In this rebuttal, Claimant criticizes management and, for the first time, states she is bothered by another employee, Cody Dufon's,

April 18, 2019
Page 4

interactions with several female employees. Mr. Putnam took these allegations relating to Mr. Dufon seriously and immediately contacted HR Director Shannon Palmer to commence a thorough investigation. (Exhibit E, Putnam Dec., ¶ 5.)

### *The Restaurant Launches a Fair and Thorough Investigation Into Claimant's Harassment Allegations.*

Ms. Palmer first spoke to Claimant as part of her investigation. Claimant disclosed she felt other female employees were being sexually harassed by Mr. Dufon outside the Restaurant. Ms. Palmer then spoke to multiple current and former Team Members and management as part of her continued investigation. The Restaurant ultimately concluded that Mr. Dufon acted inappropriately outside the workplace, including texting one female employee to ask her to go drinking with him. Mr. Putnam found Mr. Dufon's behavior to be unacceptable and a violation of Company policy. He thus immediately terminated Mr. Dufon's employment.

Mr. Putnam appreciated Claimant's report about Mr. Dufon, as well as all of the employees who reported concerns during the investigation. *Two of the female employees who spoke out most prominently against Mr. Dufon's inappropriate conduct have since been promoted at the Restaurant.* (Exhibit E, Putnam Dec., ¶ 10.)

### *Claimant Walks Out of a Meeting While Mr. Putnam is still Speaking to Her, Culminating in Her Termination.*

On December 18, 2018, Mr. Putnam and Ms. Palmer met with Claimant to again attempt to coach her and address her ongoing behavioral issues. (Exhibit E, Putnam Dec., ¶ 6.) Claimant refused to listen or respond to any questions asked by Mr. Putnam and instead retorted, "no, I'm going to ask you some questions first." (*Ibid.*) She first asked whether every employee gets a 90-day evaluation. (*Ibid.*) Mr. Putnam responded that evaluations are done for all employees when they are needed. (*Ibid.*) She then asked whether everyone's performance is evaluated, to which he replied yes. (*Ibid.*) He further explained that these are opportunities to coach employees and help employees improve. (*Ibid.*) Throughout the meeting Claimant was defensive and instead pointed blame of her poor performance to Mr. Garcia, who she claimed was an ineffective leader. (*Ibid.*) She then questioned whether Mr. Putnam was investigating her allegations against Mr. Dufon. (*Ibid.*) Ms. Palmer assured Claimant she was investigating her complaint and reminded Claimant she interviewed her just the day before regarding her claims. (*Ibid.*)

Mr. Putnam then asked Claimant whether she believes he cares about his employees. (Exhibit E, Putnam Dec., ¶ 7.) She responded, "I think so." (*Ibid.*) He then reminded her of all the dental work he provided for her son. (*Ibid.*) While he was talking, Claimant said, "I'm done," and stormed out of the office while Mr. Putnam was still attempting to speak with her. (*Ibid.*)

At this point, Mr. Putnam realized he could not manage Claimant and thus sent her home for the day, with pay, while he analyzed next steps. (Exhibit E, Putnam Dec., ¶ 8.) The next day, December 19, 2018, Mr. Putnam terminated Claimant. (*Ibid.*) She responded, "We're going to get you!" and then requested an employee meal with an extra milkshake. (*Ibid.*) Mr. Putnam allowed her to receive her last employee meal and she was walked off the property. (*Ibid.*)

April 18, 2019
Page 5

## II. LEGAL ANALYSIS

### *Claimant's Claim for Age Discrimination Fails.*

In her EEOC charge, Claimant curiously alleges she experienced age discrimination at the Restaurant. To establish a prima facie case of age discrimination, Claimant must prove that: (1) she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she was subjected to an adverse employment action due to her age; and (4) employees not in the protected class were treated more favorably. (*Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F.3d 1217, 1220.) Once a plaintiff establishes a prime facie case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for its actions. (*Texas Dept. of Comm. Affairs v. Burdine* (1981) 450 U.S. 248, 254-255.) If the employer carries its burden, the presumption of discrimination "simply drops out of the picture." (*St. Mary's Honor Ctr. v. Hicks* (1993) 509 U.S. 502, 510-511.)

Here, Claimant cannot establish a prima facie claim of age discrimination since she was not performing her job satisfactorily and she cannot demonstrate a causal connection between her age and her termination. As set forth above, Claimant was aggressive and wildly insubordinate throughout her brief tenure. Claimant talked back to management and screamed at her coworkers in front of customers. Numerous employees complained to management about Claimant. Claimant constantly deflected blame and refused to acknowledge any wrongdoing and stormed out of a meeting wherein her supervisor was attempting to address her behavioral issues. Several employees, none of whom Claimant alleges had a discriminatory animus towards her, confirm Claimant's insubordinate and defensive behavior.

Claimant also cannot establish a prima facie case of discrimination because she cannot establish a causal connection between her age and her termination. Claimant's EEOC charge does not identify a single comment or conduct demonstrating an animus based on age. Moreover, Mr. Putman hired Claimant when she was 62 years old and terminated her just three months later, negating any inference of discriminatory animus. (*Bradley v. Harcourt, Brace and Co.* (9th Cir. 1996) 104 F.3d 267, 270.) Instead, it is undisputed employees and supervisors raised concerns about Claimant's erratic behavior and unwillingness to improve her work performance, culminating in her termination.

Even if Claimant could establish a prima facie case of discrimination (she cannot), the Restaurant articulated a legitimate business purpose in terminating her employment; namely, insubordination and failing to improve both her behavior and performance issues. Claimant cannot dispute the Restaurant's articulated reason for her termination and this claim necessarily fails.

### *Claimant's Claim for Gender Discrimination Fails.*

In her EEOC charge, Claimant alleges she experienced discrimination on the basis of sex. To establish a prima facie case of gender discrimination, Claimant must prove that: (1) she is a

April 18, 2019
Page 6

member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she was subjected to an adverse employment action due to her gender; and (4) employees outside the protected class were treated more favorably. (*Godwin, supra,* 150 F.3d at p. 1220.)

Here, Claimant cannot establish a prima facie claim of gender discrimination because she cannot demonstrate she was performing her job in a satisfactory manner, as set forth above. Further, Claimant cannot establish a prima facie claim of gender discrimination because she cannot demonstrate a causal connection between her gender and an adverse employment action. Claimant has provided no evidence, or even allegation, to connect her termination to her gender. In her EEOC charge, Claimant admits that Ms. Putnam advised she was being terminated because he had lost confidence that she could perform her job. Further, the Restaurant employs numerous female employees who have not been terminated and 50% of the employees in leadership positions at the Restaurant are females. It is illogical to claim the Restaurant terminated Claimant because of her gender, but utilized multiple other female workers to perform that work without consequence. Favorable treatment of other similarly situated employees can be offered to establish a lack of discriminatory intent. (*St. Mary's Honor Ctr. v. Hicks* (1993) 509 U.S. 502, 513-514 [finding it illogical *not to consider* the makeup of the employer's work force in analyzing a discrimination claim].) This claim fails.

### *Claimant's Claim for Retaliation Fails.*

To succeed on a claim for retaliation, Claimant would have to prove a causal connection between protected activity and an adverse employment action." (*Cohen v. Fred Meyer, Inc.* (9th Cir. 1982) 686 F.2d 793, 796.)

Here, Claimant cannot establish a prima facie claim of retaliation as she cannot establish a causal connection. First, Claimant states she was placed on a performance improvement plan after reporting concerns about Mr. Dufon to Ms. Aguilar. This argument is without consequence since Ms. Aguilar did not make the decision to issue a performance improvement plan to Claimant, and was not involved in that process in any way.[1] Further, Claimant acknowledges Ms. Aguilar did not tell Mr. Putnam about Claimant's concerns.[2] (See, Claimant's EEOC charge, ¶ II.) Neither Mr. Garcia nor Mr. Putnam who initiated the December 13, 2018 meeting, knew about Claimant's allegations until receiving her December 15, 2018 letter two days later, negating any causal connection. Further, the performance improvement plan, which did not result in a demotion or termination, does not constitute an adverse employment action as a matter of law. (*Cole v. Illinois* (7th Cir. 2009) 562 F.3d 812, 816-817.)

Additionally, the reasons for Claimant's termination are abundantly clear – Claimant's attitude and behavior were inappropriate, and she created a negative work environment for her peers. The Restaurant received multiple complaints from Claimant's co-workers and supervisors regarding her unacceptable behavior. The Restaurant provided her multiple opportunities and suggestions for improvement, but Claimant failed to correct her behavior. The law is clear that an inference of retaliation does not arise when the adverse action is part of, or the culmination of, a

---

[1] Exhibit B, Aguilar Dec. ¶ 11.
[2] Claimant never reported claims of sexual harassment to Ms. Aguilar. She instead complained that Mr. Dufon was abusing his power by threatening to write people up and that a female employee moved out of his house.

April 18, 2019
Page 7

disciplinary process that was already underway prior to the protected activity.[3] The policy underlying this rule is obvious: a plaintiff cannot shield herself from a likely termination simply by engaging in protected activity. As such, Claimant cannot establish her conclusory retaliation allegation.

### III. CONCLUSION

Claimant's allegations are vague, conclusory, and insufficient to establish any of Claimant's allegations. The Restaurant terminated Claimant for her unacceptable behavior and attitude towards her co-workers and management. There was no other reason.

The Restaurant respectfully requests the EEOC dismiss this matter with a finding of no reasonable cause to believe discrimination or retaliation occurred. The Restaurant will continue to cooperate with the EEOC to bring a swift and efficient resolution to this matter. Please contact my office if you need any additional information.

Sincerely,



---

[3] See *Slattery v. Swiss Reinsurance America Corp.* (2d Cir. 2001) 248 F.3d 87, 95 ("[I]n this case the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline which began when [defendant] diminished [the plaintiff's] job responsibilities a full five months prior to his filing of the EEOC charges. Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *McElroy v. Philips Med. Sys. N. Am., Inc.* (6th Cir. 2005) 127 F.App'x 161, 170 (reversing denial of summary judgment on retaliation claim where "there was evidence that [the employee's] discharge was contemplated and underway before he engaged in the alleged protected activity"); *Pashoian v. GTE Directories* (M.D. Fla. 2002) 208 F.Supp.2d 1293, 1305 (the plaintiff could not establish prima facie case of retaliation where prior to engaging in statutorily protected activity, his employer "gave him adequate notice of the severity of his conduct and warned him of possible termination" and citing authority that there can be no prima facie case of retaliation where "wheels of termination were put in motion" before the protected activity.)

Page 8

## INDEX OF EXHIBITS

Case Name:        Lindsey Stewart v. Chick-Fil-A
EEOC Case Number: 488-2019-00255

| EXHIBIT | DOCUMENT DESCRIPTION |
|---------|----------------------|
| A. | Acknowledgment of At-Will Employment, signed by Claimant on September 13, 2018 |
| B. | Declaration of Terra C. Aguilar |
| C. | Declaration of Eric Garcia |
| D. | Written Performance Improvement Plan |
| E. | Declaration of Danny Putnam |

Lindsey Stewart
12/13/18

**Performance Improvement Plan**
- Get more efficient and fast at doing it the CFA way
    - Especially biscuits
- Write down ideas or complaints and give to Eric before discussing them
    - Don't act on new ideas without approval
- Work more efficiently - can't be holding on Kanbans
- Listen to instructions and don't fight for kitchen and leaders to make what they ask for
- Need to look at KPS monitor for specials regularly
- Control emotions and tone, especially with Leaders
- Be on time for morning shifts →  6:10 to start
- Follow our Cultural Principles - Be the team member others want to be working with

Meet again in 2 weeks to review progress.

Leader: _____

Team Member: _____